# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ROBERT E. CATTANACH, | Civil No. 13-1664 (JRT/JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| BURLINGTON NORTHERN SANTA FE, LLC and BNSF RAILWAY COMPANY, | |
| Defendants. | |

Fredric A. Bremseth and Christopher J. Moreland, **BREMSETH LAW FIRM**, 601 Carlson Parkway, Suite 995, Minnetonka, MN 55305; and Robert E. Cattanach, **DORSEY & WHITNEY LLP**, 50 South Sixth Street Suite 1500, Minneapolis, MN 55402, for plaintiff.

Emily A. Atkinson and Timothy K. Masterson, **SWEENEY & MASTERSON, PA**, 325 Cedar Street, Suite 600, St. Paul, MN 55101, for defendants.

Plaintiff Robert Cattanach brings this negligence claim against defendants BNSF Railway Company ("BNSF") and Burlington Northern Santa Fe, LLC ("BNSF LLC")[1] for injuries he sustained in a bicycling accident. Cattanach was riding with friends in St. Paul Park, MN when the front tire of his bike fell into a gap between two cement panels at a railroad crossing. Cattanach alleges that BNSF was negligent in the maintenance, upkeep, inspection and repair of the railroad crossing. This matter is now

---

[1] BNSF moves that Defendant BNSF LLC be dismissed from this case because it is not a proper party. (Defs.' Mem. in Supp. of Summ. J. at 4, 34, Dec. 26, 2014, Docket No. 71.) This issue appears to have arisen out of a simple mistake, due to the similarity of the names of the two separate entities. The record reflects that BNSF LLC does not own or operate the Broadway crossing, nor does it conduct any railroad operations in the State of Minnesota. (Aff. of Michael A. Horton ¶¶ 3-4, Dec. 26, 2014, Docket No. 73.) Therefore, the Court will grant in part the Defendants' motion for summary judgment, to the extent it relates to claims against BNSF LLC.

before the Court on Defendant's motions for summary judgment and to exclude expert testimony.

Viewing the facts in the light most favorable to the nonmoving party, the Court finds that a genuine issue of material fact remains as to whether BNSF had notice that the railroad crossing might be dangerous to passing vehicles, including bicycles. The Court also finds that Cattanach's state law tort claim is not preempted by any regulation pursuant to the Federal Railroad Safety Act of 1970 ("FRSA") and that his actions did not constitute contributory negligence as a matter of law. Further, the Court finds that the testimony of Drs. O'Brien and Sinicropi is sufficiently relevant and reliable to overcome BNSF's *Daubert* challenge, and the testimony of Raymond Duffany will be permitted except to the extent he purports to opine on BNSF's compliance with Minnesota state statutes. Thus, the Court will deny BNSF's motion for summary judgment and deny BNSF's motion to exclude expert testimony, except as to Duffany's testimony on Minnesota state law.

## BACKGROUND

## I.     CATTANACH'S INJURY

On July 15, 2012, Cattanach was riding his bike on Broadway Avenue in St. Paul Park, Minnesota. (Notice of Removal, Ex. 1 ("Compl.") ¶ 5, June 27, 2013, Docket No. 1.) When Cattanach and his riding group attempted to pass over a railroad crossing ("the Broadway crossing"), the front wheel of his bicycle dropped several inches into a gap between two cement planks separating the rails of the train track. (*Id.*) Cattanach was thrown from his bike to the pavement, causing him to sustain various injuries. (*Id.*)

Since the accident, Cattanach reports suffering ongoing complications from head, neck, right shoulder, and left hand injuries he suffered in the fall.   (Sixth Aff. of Karl E. Robinson ("Robinson Aff."), Ex. A (Dep. of Robert Cattanach ("Cattanach Dep.")) at 15:16-16:18, 20:17-21:17, Dec. 26, 2014, Docket No. 72.)[2]   When the accident occurred, Cattanach and his riding group were traveling in the eastbound lane on Broadway Avenue.   (Robinson Aff., Ex. B (Tr. of Robert Cattanach Statement Taken on July 27, 2012 ("Cattanach Statement")) at 6-7, 11-12.)   The riders were traveling side-by-side in pairs of two.   (*Id.* at 4-5, 11-12.)   Because Cattanach was traveling to the left of another rider, he was riding toward the center of the lane.   (*Id.*)

The track and the Broadway crossing are owned and maintained by defendant BNSF.   (Compl. ¶ 5.)   The Broadway crossing was part of a route that Cattanach and his cycling group regularly traveled during the preceding years.   (Cattanach Dep. at 31-32; Cattanach Statement at 5-6, 8-9.)   In fact, Cattanach believes the group had gone over the crossing one or two weeks prior to the accident.   (Cattanach Statement at 5-6.)   Although the group had observed the poor condition of the crossing, neither Cattanach nor any members of his cycling group had previously noticed the specific gap that caught Cattanach's tire on July 15, 2012.   (*Id.* at 8-9; Robinson Aff., Ex. C (Dep. of Robert D. Sturm ("Sturm Dep.")) at 51-54; Robinson Aff., Ex. D (Dep. of Heather Guggemos ("Guggemos Dep.")) at 31-35 (describing that she had previously noticed a gap between the tracks and the concrete separate from the particular gap that caused Cattanach's accident); Robinson Aff., Ex. E (Dep. of Michael Spengler ("Spengler Dep.")) at 22-24, 72.)

---

[2] Unless otherwise specified, all page numbers refer to internal document pagination.

## II.     BNSF'S MAINTENANCE OF THE BROADWAY CROSSING

The record reflects a long history of maintenance issues at the Broadway crossing, dating back to 2007.  A September 28, 2007, email from Lynn Leibfried, BNSF's then-Manager of Public Projects, first acknowledges BNSF's awareness of problems with the crossing.  (Aff. of Paula M. Jossart ("Jossart Aff."), Ex. 12, Sept. 25, 2014, Docket No. 57.)  In the email, Leibfried wrote, "BNSF recently worked on the crossing, due to drainage problems.  We replaced the concrete that was in the crossing previously . . . .  I gather they are concerned about the gap between the concrete and the rail, however that style of concrete has that problem in all locations."  (*Id.*)

Additional email messages from the following year suggest that the situation at the Broadway crossing continued to deteriorate.  St. Paul Park Municipal Client Manager Richard Seifert wrote to Leibfried in July of 2008 that "the condition is degrading at a rapid pace."  (Jossart Aff., Ex. 14.)  Seifert indicated that concrete pads near and surrounding the track were settling and failing to such an extent that rebar in the concrete was almost completely exposed.  (*Id.*)  Nearly a year later, on May 31, 2009, a St. Paul Park police officer photographed the crossing.  (Jossart Aff. ¶ 17, Ex. 16.)  The photos appear to depict the same conditions described in Seifert's emails – crumbling concrete, exposed rebar, and uneven surfaces.  (*Id.*)

On June 6, 2012, just over one month before Cattanach's accident, St. Paul Park City engineer Morgan Dawley sent an email to BNSF officials, stating:

> I've been made aware that the Broadway Avenue rail crossing surface in St. Paul Park, MN has deteriorated further, to the point that pieces of metal project upward that appear to present a safety hazard to vehicles and motorcycles, and possibly rail cars.  Please have BNSF schedule a safety

> inspection of the crossing to see if you can identify the problem and follow
> up with me as soon as possible so we can discuss the results of the
> inspection.

(Jossart Aff., Ex. 19.)  On the same day, Leibfried forwarded Dawley's message to other

BNSF officials, stating:

> Can you have someone check this crossing out?  The City and BNSF have
> been going back and forth on this for years.  I believe Golding had done
> some maintenance work and City did the paving . . . about three years ago.
> The final product didn't meet City expectations, so they have been
> complaining ever since.  From the pictures they took, it was a legitimate
> complaint.

(*Id.*)  Leibfried further indicated that the crossing would require "[f]ull concrete

replacement."  (*Id.*)  Following Leibfried's June 6 email, BNSF Roadmaster Dale

Johnson inspected the Broadway crossing and confirmed that "it is loose and the ties are

in bad shape."  (Jossart Aff., Ex. 20.)

## III.   PROCEDURAL HISTORY

Cattanach initiated this suit *pro se* in Minnesota state court in Ramsey County.

(Compl. at 1, 6.)  BNSF answered the complaint on June 24, 2013.  (Answer, June 27,

2013, Docket No. 3.)  The company acknowledged owning and operating the tracks

where the incident occurred, but denied all claims that it had been negligent.  (*Id.* ¶¶ 2-

10.)  Shortly thereafter, BNSF filed for removal to United States District Court for the

District of Minnesota.  (Notice of Removal, June 27, 2013, Docket No. 1.)

On December 26, 2014, BNSF moved for summary judgment on multiple

grounds.  (Mot. for Summ. J., Dec. 26, 2014, Docket No. 69.)  On the same day, BNSF

also moved for exclusion of expert testimony and opinions by three of Cattanach's

proposed expert witnesses.  (Mot. to Exclude Expert Witnesses & Test., Dec. 26, 2014, Docket No. 79.)  This matter is now before the Court on BNSF's motions.

## ANALYSIS

## I.      BNSF'S MOTION FOR SUMMARY JUDGMENT

BNSF moves for summary judgment on three primary grounds: (1) Cattanach cannot prove the essential element of his negligence claim that BNSF had actual or constructive notice of the gap that allegedly caused the accident; (2) Cattanach's claim is preempted by the FRSA; and (3) Cattanach was negligent as a matter of law because he was riding his bike in the middle of the road in violation of Minnesota law.

### A.      Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion

for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## B.   Actual or Constructive Notice of the Dangerous Condition

The first ground on which BNSF moves for summary judgment is that Cattanach "has not and cannot prove an essential element of his state law negligence claim, namely that BNSF had actual or constructive notice of the gap that plaintiff claims caused his accident."   (Defs.' Mem. in Supp. of Summ. J. at 1, Dec. 26, 2014, Docket No. 71). Cattanach contends that neither actual nor constructive notice is required because BNSF created the condition by its own actions.   Alternatively, Cattanach maintains that to survive summary judgment, he is not required to prove that BNSF had notice of the specific gap in the concrete that caused his injury.   Rather, he argues that he must show only that there is evidence that BNSF had sufficient notice of general unsafe conditions at the crossing.

### 1.   Condition Created By Direct Actions of a Landowner

Under Minnesota law, "[u]nless the dangerous condition actually resulted from the direct actions of a landowner or his or her employees, a negligence theory of recovery is appropriate only where the landowner had actual or constructive knowledge of the dangerous condition." *Rinn v. Minn. State Agr. Soc'y*, 611 N.W.2d 361, 365 (Minn. Ct. App. 2000).   Cattanach argues that because the gap in the concrete was caused by BNSF's direct actions, he is not required to prove that BNSF had actual or constructive

knowledge of the unsafe conditions at the crossing.  A BNSF official indicated at a deposition that BNSF used a type of concrete at the crossing that they knew deteriorated more rapidly than other types, and occasionally presented "gap problems." (Jossart Aff., Ex. 8 (Dep. of Lynn Leibfried ("Leibfried Dep.") at 15:11-21, 33:16-34:25, 36:6-24, 58:10-59:4, 59:20-60:8, 60:23-61:12, 80:22-81:4, 98:9-17.)  Cattanach claims that since a gap in the concrete did appear at some point before the time of his bike incident, the Court should find that BNSF directly created the gap.

Although it appears that BNSF was aware of the potential for quicker deterioration of the concrete at the crossing, "[m]any building materials will, over time, deteriorate and require repair or replacement.  That does not necessarily mean that the owner or occupier has created a dangerous condition or that the owner has actual or constructive knowledge of a dangerous condition." *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex. 2000); *Olds v. Marmaxx Operating Corp.*, No. H-12-1265, 2013 WL 3899326, at *3 (S.D. Tex. July 26, 2013).  Thus, merely choosing for the Broadway crossing a type of concrete that deteriorates somewhat more quickly than other types does not automatically make BNSF responsible, as a direct actor, for all consequences of that deterioration.  Rather, BNSF's selection of materials during construction may have been one factor, along with others such as time, traffic, and weather, that ultimately led to the deteriorated condition of the crossing.  Without any evidence aside from the selection of quickly deteriorating building materials to tie BNSF to the creation of the gap, the Court concludes that BNSF and its employees are not directly responsible for creating the gap at the Broadway crossing. The Court will look instead to whether BNSF had actual or constructive knowledge of the dangerous condition.

## 2.      Negligence through Actual or Constructive Knowledge

A plaintiff may recover under a theory of negligence "where the landowner had actual or constructive knowledge of the dangerous condition." *Rinn*, 611 N.W.2d at 365. "Generally, whether a condition presents a known or obvious danger is a question of fact, to be decided by the jury." *Machacek v. Wedum Shorewood Campus, LLC*, No. A12-1683, 2013 WL 3368452, at *3 (Minn. Ct. App. July 8, 2013) (internal quotation marks omitted). There is little dispute in this case about what BNSF knew. BNSF acknowledges that its officials were aware of general deterioration at the crossing because they "received complaints about the Subject Crossing before July 15, 2012 . . . ." (Defs.' Mem. in Supp. of Summ. J. at 9.) Several documents in the record show that the deteriorating conditions and problems with the concrete at the crossing had been brought to BNSF's attention over a period of several years preceding Cattanach's crash. (*E.g.*, Jossart Aff., Exs. 12, 14, 19, 20.) The parties are also in agreement, however, that BNSF had no specific knowledge of the two-inch gap that caused Cattanach's fall.

In light of the parties' relative agreement as to BNSF's knowledge of the situation at the crossing, the pertinent remaining issue is what constitutes the relevant "dangerous condition" of which BNSF needed to have knowledge to be negligent: the crossing in general, or the specific two-inch gap that actually caused Cattanach's crash? There is very little Minnesota case law with respect to how specific the landowner's knowledge must be in order to trigger negligence. Minnesota law provides that a party may be negligent if they have actual knowledge of a dangerous condition, or "[c]onstructive knowledge of a hazardous condition may be established through evidence that the

condition was present for such a period of time so as to constitute constructive notice of the hazard." *Rinn*, 611 N.W.2d at 365. It is less clear how broadly the term "hazardous condition" is meant to be construed.

BNSF seeks a narrow definition of the term, arguing that a defendant cannot be negligent unless it knows of the specific dangerous condition that caused the injury. For support, BNSF relies on *Goebel v. Salt Lake City Southern Railroad Co.*, 104 P.3d 1185 (Utah 2004). The facts in *Goebel* are highly similar to those in this case: the plaintiff was riding his bike when his wheel fell into a gap in the "field panels" at a railroad crossing, causing him to suffer injuries. *Id.* at 1189. The district court granted a motion for a directed verdict in favor of the defendant railroad company on the grounds that the railroad company did not have constructive knowledge of the dangerous condition at the crossing, and the Utah Supreme Court affirmed. *Id.* at 1189, 1192-95. Given that BNSF was not aware of the specific two-inch gap at issue in this case, BNSF argues for a comparable ruling.

*Goebel* does little to advance BNSF's argument as to adequate knowledge, however. A significant difference between the facts in *Goebel* and the facts in this case is that the railroad company in *Goebel* did not have any prior knowledge, reports, or complaints about any danger or maintenance issues, even generally, at the crossing. *Id.* at 1189, 1192-94. Instead, the only argument presented by the plaintiff to show that the company had knowledge of a dangerous condition at the crossing was the plaintiff's own theory that a gap in the panels must have developed "over time," and therefore should have been discovered by the company prior to his crash. *Id.* at 1189, 1192-94. In this case, there is substantial evidence that BNSF was aware of various problems at the

Broadway crossing, and the only real dispute is whether the scope of their knowledge is sufficient for a reasonable jury to conclude that they should have known of the particular two-inch gap that caused Cattanach's fall.

A more analogous decision is the Sixth Circuit's ruling in *Harris v. Illinois Central Railroad Co.*, 58 F.3d 1140 (6th Cir. 1995), suggesting that knowledge of general dangers can serve as the basis for a landowner's negligence as to a particular danger. In *Harris*, the plaintiff de-boarded a train at the defendant's rail yard, and was injured by stepping on a piece of loose scrap iron. *Id.* at 1141. At trial, there was ample evidence from multiple witnesses that the defendant knew that "[t]here was always debris in the [rail] yard" but that cleanup efforts were at best infrequent. *Id.* at 1142. There was little dispute that the defendant was not aware of the specific piece of scrap iron, but the Sixth Circuit upheld the district court's decision to permit the testimony about the rail yard as it related to the issue of negligence. The court found there was sufficient evidence from which a jury could infer that "the railroad knew about debris falling off cars in its [rail y]ard, [and] it was lax about keeping the debris cleaned up." *Id.* at 1143. As a result, the plaintiff "did not have to show that the [defendant] knew about the particular piece of scrap iron that caused his injury." *Id.* at 1143-44.

The record in this case contains abundant evidence that BNSF knew about deteriorating concrete, uneven surfaces, gapping, and other problems "that appear to present a safety hazard to vehicles and motorcycles." (Jossart Aff., Ex. 19.) These are the same general type of dangerous condition Cattanach alleges caused his accident. Based on this evidence, the Court concludes that a reasonable jury could find BNSF was negligent in not fixing the conditions at the crossing. Therefore, the Court will deny

BNSF's motion for summary judgment as to the issue of adequate knowledge for a negligence claim.

### C.    Federal Railroad Safety Act Preemption

Even if the Court finds that Cattanach has adequately stated a claim for negligence, BNSF argues that the FRSA preempts Cattanach's claim.   Specifically, BNSF argues that FRSA establishes a national scheme to promote rail safety in all respects and therefore preempts state laws and regulations where they "cover[]" the same subject matter.  49 U.S.C. § 20106.

The United States Supreme Court has interpreted preemption somewhat narrowly. "To prevail on the claim that regulations have pre-emptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that subject matter . . . for 'covering' is a more restrictive term which indicates that pre-emption will lie **only if the federal regulations substantially subsume the subject matter of the relevant state law**." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664-65 (1993) (emphasis added) (citations omitted).  This standard applies to state common law tort claims as well.  *See In re Derailment Cases*, 416 F.3d 787, 793 (8th Cir. 2005) (citing *Easterwood*, 507 U.S. at 664).  "It is the burden of the party advocating preemption under § 20106(a)(2) to show that a federal law, regulation, or order covers the same subject matter as the state law, regulation, or order it seeks to preempt."  *Duluth, Winnipeg & Pacific Ry. Co. v. City of Orr*, 529 F.3d 794, 797 (8th Cir. 2008).

The Court finds that nothing in the FRSA "substantially subsumes" a state common law negligence cause of action on these facts.  Indeed, a number of courts have

rejected preemption arguments where similar facts were involved. *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 187-88 (3d Cir. 2013) (holding that FRSA did not preempt claim for failure to maintain a safe crossing area); *Strozyk v. Norfolk S. Corp.*, 358 F.3d 268, 277 (3d Cir. 2004) (holding that "the [plaintiff's] claims that [the railroad company] failed to maintain a safe grade crossing . . . are not preempted"); *Murrell v. Union Pacific R.R. Co.*, 544 F. Supp. 2d 1138, 1154-55 (D. Or. 2008) (holding that the jury "must determine whether these defendants have provided ordinary care to meet the alleged unusual conditions of this crossing," and that the "failure to eliminate a dangerous condition is not preempted by federal law"); *Grimes v. Norfolk S. Ry. Co.*, 116 F. Supp. 2d 995, 1002 (N.D. Ind. 2000) (rejecting a FRSA preemption claim where the railroad was charged with negligent track inspection or failure to provide a safe walkway and the regulation cited by the defendant as support for preemption involved a speed for inspecting crossings, because "the subject matter is not identical").

In *In re Derailment Cases*, the Eighth Circuit explained that to determine whether "the FRSA will preempt a particular state law tort claim . . . we look to the extent to which the regulations adopted pursuant to the FRSA" in a particular area "substantially subsume" the state law subject matter. 416 F.3d at. at 793. In that case, the court looked at the FRSA's provisions on freight car inspections, because the claim was negligence with respect to inspecting freight cars. *Id.* at 793-94. In this case, then, where negligence is alleged with respect to maintenance of the crossing, the Court must look to the FRSA's provisions on crossings.

BNSF concedes that there are no federal regulations directly on point as to gapping in the concrete near a crossing. Instead, BNSF points to 49 C.F.R. § 213, which

includes several subparts regulating aspects of railroads.   For example, 49 C.F.R. § 213.37(b)(2) requires that railroads control vegetation adjacent to roadbeds so that it does not "[o]bstruct visibility of railroad signs and signals . . . [a]t highway-rail crossings."  BNSF also cites 49 C.F.R. § 213.109, which specifies the number and design of railroad crossties that must be contained in a given 39-foot segment of track.  *Id.*  None of the regulations cited by BNSF speak to the safety and maintenance of crossing grades. To the extent the regulation covers deterioration of crossties, it is with reference to the amount that any such deterioration might cause a rail to move out of alignment, which is presumably to prevent damage to trains and derailments, rather than to avoid injury to pedestrians or crossing vehicles such as bicycles.  *Id.*

In light of the dearth of FRSA regulations on railroad crossing safety and maintenance, the Court cannot conclude that the subject matter of Cattanach's state law tort claim is "substantially subsumed" by the FRSA.   As a result, the Court will deny BNSF's motion for summary judgment to the extent it relies on preemption.

### D.       Contributory Negligence

Finally, BNSF asks the Court to grant summary judgment because Cattanach was contributorily negligent as a matter of law for riding his bicycle near the center of the road in violation of Minnesota Statute § 169.222.  The statute provides that individuals riding bicycles on Minnesota roadways "shall ride as close as practicable to the right-hand curb or edge of the roadway . . . ."  Minn. Stat. § 169.222, subd. 4(a).  Cattanach acknowledges that he was riding near the center of the road, to the left of another rider in his group.

Under Minnesota law, "only in the clearest of cases where the facts are undisputed and can lead to but one conclusion is the court justified in finding contributory negligence as a matter of law." *Fisher v. Edberg*, 176 N.W.2d 897, 900 (Minn. 1970). Here, it is undisputed that Cattanach was riding near the center of the road, but the exact circumstances that caused him to make that choice are less clear. A bicyclist is not required to strictly adhere to the right side of the road "when [it is] reasonably necessary to avoid conditions, including fixed or moving objects, vehicles, pedestrians, animals, surface hazards, or narrow width lanes, that make it unsafe to continue along the right-hand curb or edge." Minn. Stat. § 169.222, subd. 4(a)(3). Indeed, the statute requires that "[p]ersons riding bicycles upon a roadway or shoulder shall not ride more than two abreast," *id.*, subd. 4(c), suggesting that the statute fully contemplates precisely the riding arrangement Cattanach employed at the time of his crash. The Court will not permit BNSF to avoid a jury determination on the safety of the crossing merely because Cattanach was not riding all the way to the right side of the road when the very statute BNSF invokes provides for side-by-side riding arrangements. Thus, the Court will deny BNSF's motion for summary judgment.

## II.     MOTION TO EXCLUDE EXPERT TESTIMONY

BNSF has moved to exclude the expert testimony of three of Cattanach's expert witnesses: Raymond Duffany, a rail track expert; Dr. Brendon O'Brien, Cattanach's treating chiropractor; and Dr. Stefano Sinicropi, one of Cattanach's treating physicians. Under Federal Rule of Evidence 702, expert testimony must satisfy three prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized
> knowledge must be useful to the finder of fact in deciding the ultimate issue
> of fact.  This is the basic rule of relevancy.  Second, the proposed witness
> must be qualified to assist the finder of fact.  Third, the proposed evidence
> must be reliable or trustworthy in an evidentiary sense, so that, if the finder
> of fact accepts it as true, it provides the assistance the finder of fact
> requires . . . .

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8ᵗʰ Cir. 2001) (citations and internal quotation marks omitted).  The district court has a gate keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8ᵗʰ Cir. 2006).

The Supreme Court in *Daubert* outlined particular factors for courts to consider in assessing reliability, such as (1) whether the opinion is based on scientific knowledge, is susceptible to testing, and has been tested; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology; and (4) whether the theory has been generally accepted by the scientific community.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (summarizing *Daubert* factors).  In *Kumho Tire*, however, the Court explained that "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  Rather, the law grants a district court the same broad latitude when it decides **how** to determine reliability as it enjoys in

respect to its ultimate reliability determination." *Id*. at 141-42.  The reliability inquiry is designed to "'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Marmo*, 457 F.3d at 757 (quoting *Kumho Tire*, 526 U.S. at 152).

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."  *Id*. at 758; *see also Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

## A.    Duffany

Raymond Duffany is a railway engineer retained by Cattanach to provide an expert opinion on railway safety and engineering.  He is a member of the American Railway Engineering and Maintenance of Way Association, with a Bachelor of Science degree in Civil Engineering and more than thirty years of railway engineering experience. (Seventh Aff. of Karl E. Robinson ("Seventh Robinson Aff."), Ex. C (Report of Raymond A. Duffany ("Duffany Report")) at 5, Dec. 26, 2014, Docket No. 82.)[3]   He has testified by deposition or at trial in many previous cases.  (*Id.* at 6-9.)  Duffany's focus in this case is on crossing maintenance.  To reach his conclusions, Duffany reviewed

---

[3] References to the Duffany Report will use CM/ECF pagination.

BNSF's initial disclosures, answers to interrogatories, and responses to requests for production of documents, along with a number of depositions and exhibits including photographs, diagrams, BNSF communication files, BNSF track plans, and BNSF engineering manuals.  (*Id.* at 3-5.)  His report makes a number of factual findings about the day of the accident, followed by a series of conclusions that BNSF failed to safely maintain the Broadway crossing.  (*Id.* at 10-14.)

BNSF moves to exclude any conclusions by Duffany that BNSF characterizes as "opinions concerning alleged legal standards."  (Defs.' Mem. in Supp. of Mot. to Exclude ("Defs.' Mot. to Exclude Mem.") at 15, Dec. 26, 2014, Docket No. 81.)  Of the four opinions Duffany offers, the Court finds that one is squarely a conclusion on the defendant's compliance with state law:

> Defendant was not in compliance with [Minnesota Statute] Sec. 219.071 which required BNSF to maintain the Broadway Avenue crossing so that it was safe and passable for vehicular traffic and it should have known that allowing a gap between the crossing panels created a hazard for vehicular traffic.

(Duffany Report at 14.)  Duffany's other opinions are framed as conclusions that BNSF failed to properly maintain the crossing surface at the Broadway crossing, despite notice of problems, and that "BNSF was not in compliance with its own engineering instructions and standards."  (*Id.* at 13-14.)

There is little dispute that Duffany is a qualified expert in the field of railway engineering and safety.  Thus, his explanations of what constitutes safe conditions at a crossing and whether the Broadway crossing was in alignment with what he would expect to find at a safe and well-maintained crossing is likely to benefit the jury.  He has also reviewed BNSF's engineering and safety manuals, and as an expert in railway

engineering is therefore qualified to testify about whether the conditions at the crossing matched BNSF's standards.

The Court will not, however, permit Duffany to testify about BNSF's compliance or lack thereof with Minnesota state statutes. "[E]xpert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge." *S. Pines Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). Where an expert's testimony is "little more than legal conclusions, a district court should not be held to have abused its discretion by excluding such statements." *Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005). Although experts "may refer to the law in expressing [their] opinion[s]," *Lewis v. N.M. Dep't of Health*, 275 F. Supp. 2d 1319, 1331 (D.N.M. 2003), legal compliance and liability determinations are the province of the jury.

Cattanach insists that such testimony is proper in this case, relying on a Northern District of Illinois case that permitted an expert to testify with language mirroring the text of the Federal Locomotive Inspection Act. *Haager v. Chicago Rail Link, LLC*, 232 F.R.D. 289 (N.D. Ill. 2005). Notably, the court in *Haager* did exclude one of the expert's opinions because it "provide[d] a legal opinion and instruct[ed] the jury on the meaning of a federal regulation." *Id.* at 295. To the extent the court permitted the expert's testimony, it did so because the expert's permissible opinions did not purport to opine on the defendant's compliance with the law – rather, the terminology in his report was similar to the language in the law or merely referenced a regulation in the locomotive engineering field, without attempting to explain its meaning or apply it to the facts of the case. *Id.* Here, Duffany opines explicitly on what he believes to be BNSF's failure to comply with Minnesota law. This testimony is more like the excluded opinion from

*Haager* and goes too far, invading the province of the jury. Therefore, the Court will permit Duffany to testify as to how BNSF's maintenance of the Broadway crossing deviated from how, in his experience, a safe crossing would be maintained, as well as the extent to which conditions at the Broadway crossing reflected BNSF's engineering and safety guidelines. The Court will exclude Duffany's testimony to the extent he purports to interpret and apply state law.

### B. Dr. O'Brien

Dr. O'Brien is a licensed chiropractor who treated Cattanach following the crash. He had been Cattanach's treating chiropractor for approximately eight years prior to the accident. (Seventh Robinson Aff., Ex. G (Dep. of Brendon O'Brien ("April 30, 2014 O'Brien Dep.")) at 76-84.) On August 13, 2014, two years after Cattanach's accident, Dr. O'Brien authored a four-page report for Cattanach's counsel describing his treatment of Cattanach, including an opinion on the causation of Cattanach's injuries. (Seventh Robinson Aff., Ex. D ("O'Brien Report") at 4.) In the report, Dr. O'Brien wrote, "[i]t is my clinical opinion that the residual[ symptoms] mentioned are a direct result of the injuries sustained in the bike crash on July 15th 2012." (*Id.*) Dr. O'Brien indicates that he formed his causation opinion based on his medical training, experience, review of MRIs of Cattanach's right shoulder and left hand, and his memory of treating Cattanach over the years. (April 30, 2014 O'Brien Dep. at 53.)

In forming his opinion, Dr. O'Brien did not review any of Cattanach's medical records from other providers. (Seventh Robinson Aff., Ex. H (Dep. of Brendon O'Brien ("Dec. 1, 2014 O'Brien Dep.")) at 162-63.) Dr. O'Brien's own medical records present a

somewhat unique challenge for the Court.  All of his records from prior to 2014 were apparently lost when both his primary computer and back-up hard drive failed.  (April 30, 2014 O'Brien Dep. at 25-26.)  He has not attempted to recover or reconstruct those records.  (*Id.* at 26.)

BNSF argues that Dr. O'Brien's testimony should be excluded because he failed to keep written chiropractic treatment records, and thus "the entire basis for Dr. O'Brien's opinion as to the cause of plaintiff's injuries and conditions are Dr. O'Brien's memory of his treatment of plaintiff, his review of two MRIs taken in July 2012, and his education and experience."  (Def.'s Mot. to Exclude at 9.)  BNSF points to several specific facts Dr. O'Brien is unable to recall from his treatment of Cattanach after the accident as an indication that this basis for Dr. O'Brien's conclusions is unreliable.

The Court recognizes that the loss of Dr. O'Brien's medical records is not ideal.  It does not, however, make Dr. O'Brien's testimony an automatic candidate for exclusion. Analyzing Dr. O'Brien's proposed testimony in light of *Daubert* and Rule 702, the Court finds that his testimony clears the first two hurdles presented by Rule 702 with little difficulty.  As to the first criterion, Dr. O'Brien's testimony is "based on scientific, technical, or other specialized knowledge" that will assist the trier of fact in deciding the ultimate issue in this case.  *Lauzon*, 270 F.3d at 686.  As a chiropractor who treated Cattanach over the course of ten years, including in the immediate aftermath of the crash at issue in this case, Dr. O'Brien has relied on his specialized medical knowledge to form his opinions.  Second, BNSF does not appear to challenge whether Dr. O'Brien – a licensed chiropractor – is "qualified to assist the finder of fact."  *Id.*

The third requirement is that "the testimony is based on sufficient factors or data; . . . the testimony is the product of reliable principles and methods; and . . . the expert has reliably applied the principles and methods to the facts of this case."  Fed. R. Evid. 702(b)-(d).   The Court finds that this factor, too, has been satisfied here. Dr. O'Brien's conclusions were formed using a "differential diagnosis," which is a method that the Eighth Circuit has found reliable and generally accepted in the medical community.  *See Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000) (finding differential diagnosis to be "a tested methodology, [that] has been subjected to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community"); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) (allowing testimony based on a detailed review of a patient's medical history, combined with thorough physical examinations and the medical professional's experience through working with hundreds of patients, discussions with peers, and attendance at conferences and seminars).   His differential diagnosis was based on his review of medical test results, such as the July 2012 MRIs, and his own personal treatment of Cattanach.  Although BNSF takes issue with the fact that Dr. O'Brien has relied on his own memory of that treatment, rather than on recorded treatment notes, to come to his conclusions, the Court rejects the argument that this makes Dr. O'Brien's testimony insufficiently reliable at this stage.  The Court will permit BNSF to cross-examine Dr. O'Brien at trial on the basis for his conclusions in order to highlight for the jury the data BNSF believes to be lacking, but the Court will deny BNSF's motion to exclude Dr. O'Brien's testimony at this time.

## C.     Dr. Sinicropi

Dr. Sinicropi is an orthopedic surgeon who first examined Cattanach on June 6, 2014, roughly two years after the accident.   BNSF's motion to exclude Dr. Sinicropi's testimony is based on the fact that Cattanach identified Dr. Sinicropi in his Rule 26(a)(2) disclosure as a treating physician who may be called at trial, but Cattanach had not submitted any further medical records beyond Dr. Sinicropi's initial June 6 examination. BNSF argues that "this record does not purport to provide any cause for any of plaintiff's alleged injuries or conditions." (Defs.' Mot. to Exclude Mem. at 13.)   Instead, BNSF insists, Dr. Sinicropi should not be allowed to testify because Cattanach has not provided a written report under Rule 26(a)(2)(B) or disclosed his opinions under Rule 26(a)(2)(C); *see Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008-09 (8th Cir. 1998).

As a treating physician, Dr. Sinicropi was not retained in this case for the purpose of providing expert testimony at trial.   Thus, he falls under Rule 26(a)(2)(C) and Cattanach is not required to provide a written report to BNSF as to Dr. Sinicropi's conclusions.   The Court finds that Cattanach appropriately disclosed him as a treating physician and provided BNSF with the only records it appears Dr. Sinicropi produced related to this case: the medical records from a single patient visit on June 6, 2014. Contrary to BNSF's accusation, Dr. Sinicropi's notes from the June 6 appointment offer a causation opinion by identifying as the source of Cattanach's pain symptoms: "when he fell from his bike while going over a railroad track."   (Seventh Robinson Aff., Ex. E (Dr. Sinicropi Notes) at 1, 4-5.)   On February 17, 2015, the parties stipulated to a deposition of Dr. Sinicropi, (Magistrate Judge Order Resolving Defs.' Mot. for Leave to

File an Untimely Non-Dispositive Mot. & to Compel the Dep. of Dr. Sinicropi, Feb. 17, 2015, Docket No. 104), which took place in March 2015.

The Court finds that Dr. Sinicropi's conclusions are sufficiently relevant and reliable to assist the jury in this case. Given that Cattanach timely disclosed Dr. Sinicropi and his June 6, 2014 medical notes pursuant to Rule 26(a)(2)(C), and BNSF has now had the opportunity to learn more about Dr. Sinicropi's testimony through the March 2015 deposition, the Court will deny BNSF's motion to exclude Dr. Sinicropi's testimony. If BNSF wishes to combat his testimony through challenges to the limitations of his conclusions, they may do so on cross-examination.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion for Summary Judgment [Docket No. 69] is **GRANTED in part** and **DENIED in part** as follows:

a.    The motion is **GRANTED** as to the claims against Burlington Northern Santa Fe LLC. All claims against Burlington Northern Santa Fe LLC are **DISMISSED WITH PREJUDICE**.

b.    The motion is **DENIED** in all other respects.

2.    Defendants' Motion to Exclude Expert Testimony and Opinions of Raymond Duffany, Dr. Brendon O'Brien and Dr. Stefano Sinicropi [Docket No. 79] is **GRANTED in part** and **DENIED in part** as follows:

       a.      The motion is **GRANTED** as to Raymond Duffany to the extent his testimony purports to interpret state statutes or legal standards.  The motion is **DENIED** as to Raymond Duffany in all other respects.

       b.      The motion as to Dr. Brendan O'Brien is **DENIED**.

       c.      The motion as to Dr. Stefano Sinicropi is **DENIED**.

DATED:  September 18, 2015
at Minneapolis, Minnesota.

                              s/ John R. Tunheim

                              JOHN R. TUNHEIM
                                   Chief Judge
                        United States District Court